


UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

| | |
|---|---|
| UNITED STATES OF AMERICA, | CR. 13-50154 |
| Plaintiff, | |
| vs. | REPORT and RECOMMENDATION |
| RAUL MUNOZ-ESCALANTE, | |
| Defendant. | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

Pending is Defendant's Motion to Suppress Statements and Seizure of Equipment[1] (Doc. 19). A hearing was held on Monday, March 17, 2014. Defendant was personally present and represented by his attorney of record, Mr. Terry Pechota. The Government was represented by Assistant United States Attorney Sarah Collins. Two witnesses testified at the hearing. No exhibits were received into evidence during the evidentiary hearing but two exhibits were attached to Defendant's brief (Doc. 19-1 and Doc. 19-2) and three Exhibits were attached to the Government's supplemental brief (Doc. 25-1, 25-2 and 25-3). Both parties have submitted briefs and oral argument was heard at the conclusion of the hearing. Based on a careful consideration of all the evidence, and counsel's written and oral arguments, the Court respectfully makes the following:

## RECOMMENDATION

It is respectfully recommended that Defendant's Motion to Suppress be DENIED.

## JURISDICTION

Defendant is charged in an Indictment with Conspiracy to Harbor, Encourage, and Induce Aliens to Reside in the United States in Violation of Law in violation of 8 U.S.C.

---

[1]There are two pieces of equipment at issue in this motion. The first is a 1999 Oldenberg Lake Shore Timberline crawler delimber, model SDLa, serial number 153 (hereinafter the "delimber." The second is a CAT 525B skidder, serial number CAT0525BH3KZ00731 (hereinafter the "skidder.").

§1324(a)(1)(A)(v)(I) and Harboring, Encouraging and Inducing Aliens to Reside in the United States in Violation of Law in violation of 8 U.S.C. § 1324(a)(1)(A)(v)(II). The pending Motion was referred to the Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and Judge Schreier's Standing Order dated March 18, 2010.

## FACTUAL BACKGROUND

On September 27, 2012, United States Forest Service (USFS) Agents Samuel ("Vince") Sidders and Craig Perry and several other agents from various state and federal agencies conducted surveillance and a contract compliance check in the Black Hills National Forest in connection with a larger investigation known as "Operation Timber Ridge." Sidders, Perry and others arrived in a part of the Forest known as "Site 2" at approximately 5:30 a.m. The following is their account of observations and interactions with the persons on Site 2 on September 27, 2012:

### Vince Sidders

Agent Sidders along with Agent Perry was conducting a compliance check for the USFS Site 2 on September 27, 2012. His compliance check was to determine whether Munoz Logging was in compliance with their contract with the USFS and was part of a larger scale investigation. Previous surveillance from the larger investigation revealed that Mr. Raul Munoz-Escalante ("Munoz") and possibly others would probably be working Site 2. Sidders and the other officers maintained enough distance that they could not be seen by the people working at the logging site. Sidders had been provided with photographs, names, and physical descriptions of the people expected to be at the Site. The USFS contract that had been awarded to the Site belonged to Munoz Logging Company.

Deputy Smith from the Pennington County Sheriff's office alerted Sidders via hand-held radio at approximately 8:00 a.m. that Munoz and another person[2] had arrived at the Site. Two log trucks were on the Site. Munoz and Estrada arrived and started operating a boom delimber and a

---

[2]The other person was eventually identified as Juan Estrada.

skidder. Sidders and Perry decided to approach the site to interview Munoz and Estrada. Also present were Homeland Security agents and Enforcement and Removal Operations (ERO) agents from Homeland Security. Those agents, however, initially remained a distance away and out of sight.

Perry was wearing a full USFS uniform which includes a badge and duty belt. Sidders was in plain clothes and wore a safety vest and helmet, along with his credentials and sidearm. The sidearm was not readily visible nor did Sidders display or un-holster it during the encounter with Munoz. Perry's duty belt included a firearm, pepper spray, baton and handcuffs. Perry likewise did not display his firearm or any of the other items from his duty belt during the September 27 encounter at Site 2. None of the other agents or officers from Homeland Security displayed their weapons during the September 27 encounter at Site 2.

Munoz and Estrada were in the cab of the boom delimber. Sidders and Perry approached the boom delimber to talk with Munoz and Estrada. The other agents remained in their vehicles and out of sight. Sidders and Perry waived Munoz and Estrada down. They stepped out of the delimber. Perry spoke with Munoz. The agents indicated they were doing a worksite safety check in accordance with the USFS contract. Sidders used a standard form to ask Estrada questions. Sidders asked Estrada who he worked for,[3] what type of benefits he received, how long he had been employed, whether housing was provided for him, and various other questions pertaining to compliance with the USFS contract. Sidders spoke to Estrada and Perry spoke to Munoz, but Sidders and Perry worked from the same list of questions.

Munoz did not indicate he had any trouble understanding the conversation. Had there been any difficulty communicating, Spanish speaking agents from Homeland Security were on hand to assist. Sidders noticed Munoz had an accent, but had no problem communicating with him in English. Perry recalled that Munoz commented he'd been in the United States for over twenty years.

---

[3]Estrada indicated he worked for Munoz Logging and that Raul Munoz was the person who paid him.

3

Estrada had "broken" English and they immediately requested assistance from one of the Homeland Security ERO agents to communicate with him.

The interview with Munoz was conversational. Perry told Munoz the purpose of the interview was to ask questions about the worksite. Munoz had unrestrained freedom of movement during the interview and would have been allowed to leave if he wished. Munoz was not, however, advised of what are commonly known as the *Griffin* or *Miranda* warnings before the interview began.[4] Voices were not raised. Sidders did not hear any of the other officers raise their voices. No threats or promises were made. Munoz never indicated he did not wish to speak with the officers or that he wanted to speak with a lawyer. Munoz was cooperative throughout the encounter. Munoz was not handcuffed or restrained. Sidders remained within 30-40 feet from Perry during the time Munoz was questioned. The men were questioned separately, which is standard procedure to avoid one person influencing the answers of the other. Perry was unavailable to testify at the evidentiary hearing because of a recent injury, but his report is attached to the Defendant's Brief (Doc. 19-1). Sidders' recollection of events is the same as is depicted in Perry's report.[5]

The Enforcement and Removal Officers from the Department of Homeland Security eventually determined that Estrada was from Mexico and in this country illegally. A Homeland Security agent arrested Estrada. The initial interview lasted about 15 minutes. Once it was decided Estrada would be detained, his encounter was extended. Mr. Munoz's interview was concluded by that time, but Sidders continued to engage him in small talk.

Sidders did not search the vehicles or equipment. Estrada wore a hat that depicted a marijuana leaf. The emblem on Estrada's hat caused Sidders concern that controlled substances

---

[4] *United States v. Griffin*, 922 F.2d 1343 (8th Cir. 1990); *Miranda v. Arizona*, 384 U.S. 436, (1966).

[5] Sidders acknowledged that Perry indicated in his report that Munoz was "released" after Perry obtained the serial numbers from the equipment. Sidders interpreted this phrase to mean that the compliance check was complete and the officers had no further interaction with Munoz.

4

might be present in the equipment so he asked Munoz for permission to look inside the equipment. Munoz gave permission. Sidders looked inside the equipment but did not see anything of concern. There were two pieces of heavy equipment on Site 2, a boom delimber and a skidder. It was Sidders' understanding both belonged to either Munoz or Munoz Logging. Perry recorded the serial numbers and model numbers while he was on Site 2 on September 27. Sidders did not tell Munoz on September 27 that the equipment would be seized. Sidders estimates the law enforcement officers were on the site for approximately an hour on September 27. Sidders did not intend to take the equipment that day and did nothing to affect Munoz's ability to access or use the equipment before the officers left the scene on September 27. Munoz was not arrested on September 27 and the equipment remained on Site 2 when the officers left. Sidders left and returned to his duty station in Colorado the day after the compliance check.

**Travis Lunders**

Lunders is a Special Agent for the United States Forest Service. He is the lead agent for this case. He used the contract applicable for the particular Site to determine how to conduct the operation on Site 2 on September 27, 2012. Lunders is familiar with Raul Munoz Escalante from previous timber sales and from both past and recent encounters. In previous encounters from the early 2000's Lunders never had trouble communicating with Munoz in English. Lunders encountered Munoz very recently again after September 27, 2012 and before the indictment in this case when Munoz accompanied Pascual Munoz to the federal courthouse for an interview.[6] During that encounter again, Lunders had no problem whatsoever conversing with Munoz in English.

Whenever a company enters into a contract with the USFS, it agrees to subject itself to inspection regarding safety conditions, wage and payment of employees, and the conditions of its

---

[6]The exact date of this courthouse encounter is unknown but it is clear it occurred after the September 27, 2012 interview at Site 2 because Lunders explained Mr. Pechota had by then appeared on Munoz's behalf in the proceedings regarding the forfeiture of the equipment. Lunders explained the courthouse encounter occurred before Munoz was indicted in this case (December 2013) but after the Black Hills blizzard in October, 2013. (*See* http://www.keloland.com/newsdetail.cfm/thousands-of-cattle-dead-in-blizzard/?id=154348).

5

equipment.[7] The USFS customarily enters onto the equipment on Site to check for safety compliance. Serial numbers are customarily found on the outside frame of the equipment, and sometimes inside the cab. Lunders was not on Site 2 during the September 27, 2012 Site inspection. He was on the Site on September 28. On September 28 he placed a Notice to Seize on the equipment under the authority of the Department of Homeland Security.

There were three pieces of equipment on the Site. Two of the pieces of equipment (the skidder and delimber) belonged to Raul Munoz. After Lunders placed the notices on the equipment, the Division of Fines, Penalties and Forfeiture within the Department of Homeland Security also sent letters to the owners. Thereafter attorneys for the owners of the equipment followed a separate procedure to contest the forfeiture. The equipment was removed from the forest because of vandalism concerns and because of the Department did not want the equipment to be removed without authorization. The equipment was shipped to a secure storage facility in Nebraska.

## DISCUSSION

Defendant moves to suppress the statements he made to USFS and Homeland Security officers on September 27, 2012, and the seizure of the delimber and skidder which occurred the following day. Defendant bases his motion upon his claim that the September 27, 2012 interview was custodial and that the USFS and Department of Homeland Security agents did not have a warrant to seize the equipment.

### Burden of Proof

As a general rule, the burden of proof is on the defendant who seeks to suppress evidence. *United States v. Phillips*, 540 F.2d 319 (8th Cir.1976). The Government, however, bears the burden of proving that Miranda warnings were either not necessary or that they were given and effectively

---

[7]Lunders explained that Nieman Timber Company contracted to buy the timber from the USFS. Munoz Logging was the declared subcontractor on Site 2. Although Munoz's company (Black Hills Delimber) was a sub-contractor of Munoz Logging, it was bound by the terms of the main contract with the USFS.

6

waived. *Miranda v. Arizona*, 384 U.S. 436, 475, 86 S.Ct. 1602, 1628, 16 L.Ed.2d 694 (1966); *United States v. Short*, 790 F.2d 464, 467-68 (6th Cir. 1986); *United States v. Charbonneau*, 979 F.Supp. 1177, 1181 (S.D. Ohio 1997). The Government also bears the burden of justifying a warrantless search or seizure. *United States v. Bruton*, 647 F.2d 818 (8th Cir.1981). The standard of proof is a preponderance of the evidence. *Lego v. Twomey*, 404 U.S. 477, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972). The parties agree in this case that the officers did not read Munoz his *Miranda* rights before the interview at Site 2, and that the Government did not have a warrant to seize the equipment on September 28, 2012. The issue in this case, therefore, is whether *Miranda* warnings and/or a warrant were necessary at all.

### 1. Munoz's September 27, 2012 Interview at Site 2 was Not Custodial

"*Miranda* warnings 'protect the individual against the coercive nature of custodial interrogation' and are required only when a person is in custody." *United States v. Thomas*, 664 F.3d 217, 222 (8th Cir. 2011) (citation omitted). The mere fact that an investigation has focused on a particular suspect does not trigger the need for *Miranda* warnings in noncustodial settings. *United States v. Goudreau*, 854 F.2d 1097, 1098 (8th Cir. 1988) (citations omitted). The custody determination consists of a two-part inquiry: (1) the circumstances surrounding the interrogation and (2) whether a reasonable person would have felt at liberty to end the interrogation and leave under those circumstances. *Thomas*, 664 F.3d at 222. In other words, "the initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." *Thatsaphone v. Weber*, 137 F.3d 1041, 1045 (8th Cir. 1998) (citations omitted).

The Court must, on a case-by-case basis, examine the totality of the circumstances, including the extent of the physical or psychological restraints placed on the suspect during the interrogation. *United States v. Griffin*, 922 F.2d 1343, 1347 (8th Cir. 1990). Further,

> A consistent line of inquiry has developed from this case-by-case approach which has identified several common indicia of custody. These indicia of custody relate to he specific police practices employed during questioning which tend to either mitigate or aggravate an atmosphere of custodial interrogation. This inquiry into the indicia

7

> of custody has generally focused on an examination of (1) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest; (2) whether the suspect possessed unrestrained freedom of movement during questioning; (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions; (4) whether strong arm tactics or deceptive stratagems were employed during questioning; (5) whether the atmosphere of the questioning was police dominated; or (6) whether the suspect was placed under arrest at the termination of the questioning.

*Id.* at 1349. In *United States v. Czichray,* 378 F.3d 822, 827 (8th Cir. 2004), however, the Eighth Circuit cautioned the *Griffin* factors are by no means exhaustive and should not be applied "ritualistically." *Id.* Nonetheless, the *Griffin* factors still appear in Eighth Circuit case law after *Czichray,* and continue to be cited with approval for determining the custody issue. *See e.g. United States v. Lowen,* 647 F.3d 863 (8th Cir. 2011). In *Lowen* the Court again emphasized that while the *Griffin* factors remain relevant, they are not the exclusive means to determine custody. "When the factors are invoked, it is important to recall that they are not by any means exclusive, and that 'custody' cannot be resolved merely by counting up the number of factors on each side of the balance and rendering a decision accordingly. The ultimate inquiry must always be whether the defendant was restrained as though he were under formal arrest." *Id.* at 867. In *Lowen* the Eighth Circuit held the interview was non-custodial although the officers did not inform the defendant he was not under arrest "as the touchstone of [the] inquiry remains whether [the defendant] was restrained as though he were under formal arrest." *Id.* at 868. *See also United States v. Holleman,* 2014 WL 747606 at *7 (8th Cir. Feb. 27, 2014) (applying the *Griffin* factors to find interrogation non-custodial in part because interview occurred in a parking lot "we do not believe a reasonable person in [defendant's] position would believe he was not free to leave the parking lot.").

The totality of the circumstances in this case leads me to conclude that the September 27, 2012 interview was not custodial. (1) Specifically, I find credible Agent Sidders' testimony that Munoz was not specifically informed the interview was voluntary; not informed that he was not under arrest and not informed he would not be arrested at the termination of the interview; not informed that he was free to leave, or that he could stop the interview at any time. This, however

8

is not necessarily indicative of custody in light of the fact that the stated purpose of the interview was a commonplace USFS contract compliance check to which all USFS contractors and subcontractors agree as a condition of accepting the benefits of USFS contracts; (2) Agent Sidders credibly testified that Munoz was not physically touched or restrained at any time during the interview. The interview occurred outside in the Black Hills National Forest. Munoz did not present any evidence that his freedom of movement was restrained during his brief fifteen minute interview; (3) Munoz did not initiate contact with USFS and Homeland Security agents but voluntarily acquiesced in Agent Perry and Sidders' request to respond to questions; (4) There was no evidence that strong arm tactics or deceptive stratagems were used during questioning; (5) The atmosphere probably was police dominated, because although the interview occurred outside in the Black Hills National Forest, there were eventually several uniformed officers present. There is no evidence, however, that any of the officers displayed or un-holstered their weapons. (6) Although Munoz's co-worker (Estrada) was arrested because he was found to be an illegal alien, Munoz was not arrested at the conclusion of the interview. He remained in the forest after the officers left the scene. In fact, the docket reflects that Munoz was not arrested until over a year later, in December, 2013 after the indictment was issued in this case.

Finally, Munoz also asserts his lack of English skills also have bearing on the custody issue. "[A] suspect's language skills may be relevant to the 'in custody' issue." *Thatsaphone v. Weber*, 137 F.3d 1041, 1045 (8th Cir. 1998). The issue is not, however, whether Munoz subjectively believed he was in custody because he did not understand the conversation. "[T]he ultimate issue is whether a reasonable police officer conducting [the] otherwise non-custodial interview would have given *Miranda* warnings because he realized that the questioning would be perceived by [the suspect] as custodial due to his limited English language skills." *Id.* Both Sidders and Lunder were questioned extensively about their perception of Munoz's ability to understand the English language and/or what was happening on September 27th. Both indicated Munoz did not appear to have any difficulty conversing in English. Their testimony was unwavering in this regard. Given this set of facts, I am compelled to find that a reasonable officer in either Agent Perry or Agent Sidders' position would not have given the *Miranda* warnings in this otherwise non-custodial setting because

9

he believed Munoz, because of his limited English skills, nonetheless perceived himself to be "in custody." Put another way, Munoz was not in custody. Sidders and Perry reasonably believed that Munoz understood he was not in custody. The *Miranda* warnings, therefore, were not required.

### 2. Munoz's September 27, 2012 Interview Was Voluntary and was Not Rendered Involuntary By a Language Barrier

The Supreme Court has recognized that "noncustodial interrogation might possibly in some situations, by virtue of some special circumstances, be characterized as one where 'the behavior of . . . law enforcement officials was such as to overbear [the suspect's] will to resist and bring about confessions not freely self-determined . . .'" *Beckwith v. United States*, 425 U.S. 341, 347, 96 S.Ct 1612, 1617, 48 L.Ed.2d 1 (1976)(citations omitted). Therefore, Munoz's statements may still be suppressed even though they were made in a noncustodial setting if the statements were not voluntarily made.

"In considering whether a confession was voluntary, the determinative question is whether the confession was extracted by threats, violence, or promises (express or implied), such that the defendant's will was overborne and his or her capacity for self-determination was critically impaired." *United States v. Pierce*, 152 F.3d 808, 812 (8th Cir. 1998). The Court must look to the totality of the circumstances, "including the conduct of the law enforcement officials and the defendant's capacity to resist any pressure." *Id.* Also, "[p]olice coercion is a necessary prerequisite to a determination that a waiver was involuntary . . . " *United States v. Turner*, 157 F.3d 552, 555 (8th Cir. 1998). In other words, "personal characteristics of the defendant are constitutionally irrelevant absent proof of 'coercion brought to bear on the defendant by the state.'" *United States v. Rohrbach,* 813 F.2d 142, 144 (8th Cir. 1987)(citations omitted). Finally, "[c]oercive official activity is a necessary predicate to a finding that a statement is not voluntary. The fifth amendment privilege against self- incrimination is not concerned with other types of psychological pressures. An incriminating statement is not involuntary unless extorted from the accused by means of coercive activity." *U.S. v. Goudreau* 854 F.2d 1097, 1099 (8th Cir. 1988)(citations omitted).

10

In this case, Munoz does not seriously contend that Sidders, Perry or any of the other officers on Site 2 on September 27, 2012 extracted his statement by "threats, violence, or promises (express or implied), such that the [his] will was overborne and his ... capacity for self-determination was critically impaired." *United States v. Pierce*, 152 F.3d 808, 812 (8th Cir. 1998). There was no evidence presented that this type of necessary coercive official activity occurred. Instead, Munoz argues (again) that his poor English skills rendered his statements involuntary. *Thatsaphone* is instructive. "Detective Bailey in the twenty minute interview used no improperly coercive questioning tactics, and Thatsaphone's responses and conduct gave no indication coercion was causing his will to be overborne, either by his lack of English language skills or any other factor. . . . Thatsaphone's incriminating statements were not constitutionally involuntary." *Thatsaphone*, 137 F.3d at 1047. *See also, United States v. Pena-Ponce*, 588 F.3d 579, 584 (8th Cir. 2009)("Whether or not the suspect has actually consented to a search, the Fourth Amendment requires only that the police reasonably believe the search to be consensual. The focus is not whether the defendant subjectively consented, but rather, whether a reasonable officer would believe consent was given and can be inferred from words, gestures, or other conduct.") (citations omitted, punctuation altered). Similarly, in this case there was no evidence presented that Munoz's responses or conduct on September 27, 2012 gave the officers any indication or reason to believe coercion was causing his will to be overborne, either by his lack of English skills or any other factor. Munoz's statements, therefore, were constitutionally voluntary. For all of the reasons explained above, it is respectfully recommended to the District Court that Defendant's Motion to Suppress Statements be DENIED.

### 3. The Warrantless Seizure of the Equipment

Finally, Munoz asserts "the seizure of this equipment was without a search warrant or other legal process and therefore lacked probable cause because, among other things, there was no evidence that defendant had committed any crime or that seized property could be found at a specific location." *See* Doc. 19 at p. 2. The Government asserts no warrant was necessary because (1) the USFS and Homeland Security officers were not on private property but were on lawfully on USFS land and (2) it was authorized to seize the equipment pursuant to statute (8 U.S.C. § 1324(b)(1)) and administrative procedure (19 C.F.R. § 162.21(a)).

The Government claims because the USFS and Homeland Security officers observed Estrada (an illegal alien who was employed by Munoz and/or Munoz's company) operating the equipment on September 27, 2012, "the property was lawfully seized and should not be suppressed as evidence." *See* Doc. 25 at p. 4.

Munoz has been indicted and charged with Conspiracy to Harbor, Encourage, and Induce Aliens to Reside in the United States in Violation of Law pursuant to 8 U.S.C. § 1324(a)(1)(A)(v)(I) and Harboring, Encouraging, and Inducing Aliens to Reside in the United States in Violation of Law pursuant to 8 U.S.C. § 1324(a)(1)(A)(v)(II). Pursuant to 8 U.S.C. § 1324(b), property used in the commission of such crimes may be seized and is subject to forfeiture. **8 U.S.C. § 1324(b)** provides in relevant part:

> **(b) Seizure and forfeiture**
> **(1) In general**
> Any conveyance, including any vessel, vehicle, or aircraft, that has been or is being used in the commission of a violation of subsection (a) of this section, the gross proceeds of such violation, and any property traceable to such conveyance or proceeds, shall be seized and subject to forfeiture.
> **(2) Applicable procedures**
> Seizures and forfeitures under this subsection shall be governed by the provisions of Chapter 46 of Title 18 relating to civil forfeitures, including section 981(d) of such Title, except that such duties are imposed upon the Secretary of Treasury under the Customs laws described in that section shall be performed by such officers, agents, and other persons as my be designated for that purpose by the Attorney General.

In turn, the civil forfeiture procedure to which 8 U.S.C. § 1324(b) refers is found at 18 U.S.C. § 981 et. seq. While 8 U.S.C. § 1324(b) refers specifically to 18 U.S.C. § 981(d), and the Defendant draws the Court's attention to **18 U.S.C. § 981(b)(2),** which provides:

> **(2)** Seizures pursuant to this section shall be made pursuant to a warrant obtained in the same manner as provided for a search warrant under the Federal Rules of Criminal Procedure, except that a seizure may be made without a warrant if–
>
> **(A)** a complaint for forfeiture has been filed in the United States district court and the court issued an arrest warrant in rem pursuant to the Supplemental Rules for Certain Maritime and Admiralty Claims;

12

      **(B)** there is probable cause to believe that the property is subject to forfeiture and–
          **(i)** the seizure is made pursuant to a lawful arrest or search; or
          **(ii)** another exception to the Fourth Amendment warrant requirement would apply; or;
      **(C)** the property was lawfully seized by a State or local law enforcement and transferred to a Federal agency.

Finally, **18 U.S.C.§ 981(d)** provides:

> **(d)** For purposes of this section, the provisions of the customs laws relating to the seizure, summary and judicial forfeiture, condemnation of property for violation of the customs laws, the disposition of such property or the proceeds from the sale of such property under this section, the remission or mitigation of such forfeitures and the compromise of claims (19 U.S.C. § 1602 et. seq.) insofar as they are applicable and not inconsistent with the provisions of this section, shall apply to seizures and forfeitures incurred, under this section, except that such duties as are imposed upon the customs officer or any other person with respect to seizure and forfeiture of property under the customs laws shall be performed with respect to seizures and forfeitures of property under this section by such officers, agents, or other persons as may be authorized or designated for that purpose by the Attorney General, the Secretary of the Treasury, or the Postal Service, as the case may be. The Attorney General shall have sole responsibility for disposing of petitions for remission or mitigation with respect to property involved in a judicial forfeiture proceeding.

The Government explains that once forfeiture proceedings were initiated Defendant Munoz, through his attorney, submitted claim forms pursuant to **18 U.S.C. § 983**. That statute provides in part:

> **§ 983. General Rules for civil forfeiture proceedings**
> **(a) Notice; claim; complaint.--**
>     **(1)(A)(I)** Except as provided in clauses (ii) through (v), in any nonjudicial civil forfeiture proceedings under a civil forfeiture statute, with respect to which the Government is required to send written notice to interested parties, such notice shall be sent in a manner to achieve proper notice as soon as practicable, and in no case more than 60 days after the date of the seizure.
>         **(ii)** No notice is required if, before the 60 day period expires, the Government files a civil judicial forfeiture action against the property and provides notice of that action as required by law.
>         **(iii)** If, before the 60-day period expires, the Government does not file a civil judicial forfeiture action, but does obtain a criminal indictment containing an allegation that the property is subject to forfeiture the Government shall either–
>             **(I)** send notice within 60 days and continue the nonjudicial civil forfeiture proceeding under this section; or

>> **(II)** terminate the nonjudicial civil forfeiture proceeding and take the steps necessary to preserve its right to maintain custody of the property as provided in the applicable criminal forfeiture statute.

\*\*\*\*\*

> **(2)(A)** Any person claiming property seized in a nonjudicial civil forfeiture proceeding under a civil forfeiture statute may file a claim with the appropriate official after the seizure.
> **(B)** a claim under subparagraph (A) may be filed not later than the deadline set forth in a personal notice letter (which deadline may not be earlier than 35 days after the date the letter is mailed), except that if that letter is not received, Then a claim may be filed not later than 30 days after the date of final publication of notice of seizure.
> **(C)** a claim shall–
>> **(i)** identify the specific property being claimed;
>> **(ii)** state the claimant's interest in such property; and
>> **(iii)** be made under oath, subject to penalty of perjury.
>
> **(D)** A claim need not be made in any particular form. Each federal agency conducting nonjudicial forfeitures under this section shall make claim forms generally available on request, which forms shall be written in easily understandable language.
> **(E)** Any person may make a claim under subparagraph (A) without posting bond with respect to the property which is the subject of the claim.
> **(3)(A)** Not later than 90 days after a claim has been filed, the Government shall file a Complaint for forfeiture in the manner set forth in the Supplemental Rules for Certain Admiralty and Maritime Claims or return the property pending the filing of a Complaint, except that a court in the district in which the Complaint will be filed may extend the period for filing a complaint upon good cause shown or upon agreement of the parties.
>> **(B)** If the Government does not–
>>> **(i)** file a complaint for forfeiture or return the property in accordance with subparagraph (A); or
>>> **(ii)** before the time for filing a complaint has expired–
>>>> **(I)** obtain a criminal indictment containing an allegation that the property is subject to forfeiture; and
>>>> **(II)** take the steps necessary to preserve its right to maintain custody of the property as provided in the applicable criminal forfeiture statute,
>>
>> the Government shall promptly release the property pursuant to regulations promulgated by the Attorney General, and may not take any further action to effect the civil forfeiture of such property in connection with the underlying offense.

The Government also cites the Code of Federal Regulations, **19 C.F.R. § 162.21**, in support of Agent Lunders' authority to seize the skidder and delimber. That section provides in relevant part:

> **§162.21(a) Seizures by Customs Officers.** Property may be seized, if available, by any Customs officer who has reasonable cause to believe that any law or regulation enforced by Customs and Border Protection or Immigration and Customs Enforcement has been violated, by reason of which the property has become subject to seizure or forfeiture. This paragraph does not authorize seizure when seizure or forfeiture is restricted by law or regulation (see, for example § 162.75), nor does it authorize a remedy other than seizure when seizure or forfeiture is required by law or regulation. A receipt for seized property shall be given at the time of seizure to the person from whom the property is seized.

The Fourth Amendment "secures persons, houses, papers and effects of the people against unreasonable searches and seizures by the government, and requires a showing of probable cause prior to the issuance of a warrant." *United States v. Martin*, 806 F.2d 204, 206 (8th Cir. 1966). Agents Perry and Sidders did not need a warrant to enter the Black Hills National Forest to conduct the compliance check on September 27, 2012. *United States v. Ricinski*, 658 F.2d 741, 745-46 (10th Cir. 1981) (lumber company agreed to unannounced inspections by USFS, Fourth Amendment challenge to inspection rejected because "inspection was an event which could occur at any time chosen by the Forest Service agents without notice.").

The parties agree that 8 U.S.C. § 1324(b) applies. That statute indicates the rules governing civil forfeiture, particularly 18 U.S.C. § 981(d), apply. Munoz asserts that pursuant to § 981(b)(2), however, seizures may be made only pursuant to a warrant obtained in compliance with the Federal Rules of Criminal Procedure. Munoz fails to acknowledge, however, that § 981(b)(2)(B)(ii) indicates a seizure may be made without a warrant if there is probable cause to believe the property is subject to forfeiture and an exception to the Fourth Amendment warrant requirement applies. Case law indicates the seizure of vehicles for forfeiture purposes "has long been a recognized exception to the warrant requirement." *United States v. One 1975 Pontiac Lemans Vehicle*, 621 F.2d 444, 450 (1st Cir. 1980) (citation omitted, gathering cases). *See also United States v. Milham*, 590 F.2d 717, 720 (8th Cir. 1979) (upholding warrantless search and seizure of vehicle pursuant to forfeiture provisions in 21 U.S.C. § 881(b), which also refers to civil forfeiture procedures set forth

in 18 U.S.C. § 981(b)); *Capraro v. Bunt*, 44 F.3d 690, 691 (8th Cir. 1995) ("Because a vehicle is subject to warrantless search on probable cause if the vehicle contains evidence of a crime, the vehicle itself should likewise be subject to warrantless seizure if the vehicle itself is an instrument of crime.") *citing* 3 WAYNE R. LAFAVE, *Search and Seizure*§ 7.3(a) (2d. Ed. 1987 & Supp. 1994).

Finally, 18 U.S.C. § 981(d) instructs that the provisions of the customs laws relating to seizure and forfeiture (19 U.S.C. § 1602 et. seq.) "insofar as they are applicable and not inconsistent with the provisions of this section" applies. A review of 19 U.S.C. § 1603 reveals that it instructs property subject to forfeiture *may* be seized by the appropriate officer upon process issued in the same manner as provided for a search warrant under the Federal Rules of Criminal Procedure. "This authority is in addition to any seizure authority otherwise provided by law." *Id.* In *United States v. One 1975 Pontiac Lemans Vehicle*, 621 F.2d 444, 448-49 (1st Cir. 1980), the Court rejected the argument that similar language in the forfeiture provisions of the Internal Revenue Code permits seizures only on authority of a warrant. "Literally, the statute merely permits the use of a search warrant to effectuate a seizure, and we find nothing in either this specific language or the statutory scheme as a whole that reflects any congressional intent to require a warrant for the execution of section 7302 seizures." *Id.* at p. 449.

Agent Sidders credibly testified that he observed Estrada, who was an illegal alien, operating the subject equipment on September 27, 2012. There was probable cause to believe, therefore, that the equipment was being used "in the commission of a violation of subsection (a)" pursuant to 8 U.S.C. § 1324(b). As such, it was subject to forfeiture. Because the seizure of vehicles for forfeiture purposes "has long been a recognized exception to the warrant requirement " (*United States v. One 1975 Pontiac Lemans Vehicle*, 621 F.2d 444, 450 (1st Cir. 1980)), no warrant was required pursuant to 18 U.S.C. § 981 et. seq. It is respectfully recommended to the District Court that Defendant's Motion to Suppress Seizure of the equipment be DENIED.

## CONCLUSION

For the reasons more fully explained above, it is respectfully RECOMMENDED to the District Court that Defendant's Motion to Suppress Statements and Seizure of Equipment (Doc. 19) be DENIED.

## NOTICE TO PARTIES

The parties have fourteen (14) days after service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained. Failure to file timely objections will result in the waiver of the right to appeal questions of fact. Objections must be timely and specific in order to require de novo review by the District Court.

*Thompson v. Nix*, 897 F.2d 356 (8th Cir. 1990)

*Nash v. Black*, 781 F.2d 665 (8th Cir. 1986)

Dated this 31 day of March, 2014.

BY THE COURT:

_____
John E. Simko
United States Magistrate Judge

17